**Dissenting Opinion Filed August 28, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-18-00884-CR

**MICHAEL SHANNON THEDFORD, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 296th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 296-80655-2018**

## DISSENTING OPINION
Before Justices Partida-Kipness, Nowell, and Evans
Dissenting Opinion by Justice Evans

"Forgetting a baby in a car is not inherently sufficiently negligent to merit a criminal sanction" is the thesis of appellant Michael Shannon Thedford's brief. Appellant does not contest he alone caused the death of his six-month-old child, F.T., by leaving her in the car for at least four hours on a hot day in late June in Texas while he slept in his air-conditioned house. A jury convicted appellant of criminally negligent homicide (count I) and criminally negligent child abandonment (count III). The trial court entered judgment for criminally negligent homicide and sentenced appellant to two-years' confinement in the state jail, probated for five years, pursuant

to the agreement of the parties. Based on his thesis, appellant appeals his conviction in one issue, that the evidence is insufficient to prove the culpable mental state to convict him of criminally negligent homicide. The majority agrees with appellant there is insufficient evidence, and judicially acquits him of the offense. Because the evidence is sufficient to support his conviction, I would affirm. Accordingly, I respectfully dissent.

## I.
### BACKGROUND FACTS

The following facts were admitted into evidence during the guilt/innocence phase of trial. On June 21, 2016 in Melissa, Collin County, Texas, appellant placed his three children into their car seats, buckling in F.T.,[1] for the 2.1 mile drive from his home to their day care. A mirror in the front and another at the top of F.T.'s car seat allowed the driver to see F.T. in her car seat. In order for appellant to drop off only his two older children, C.T. and H.T., appellant checked in only those two. To do so, he applied his finger to the fingerprint reader attached to the computer used

---

[1] State's Exhibit 43, recorded interview with Investigators Mitch Selman and Danny Stasik on June 21, 2016, transcribed in relevant part:

INVESTIGATOR SELMAN: So you dropped the kids off at daycare, the other two kids?

MICHAEL THEDFORD: (Nods head up and down.) Yes.

INVESTIGATOR SELMAN: Came back in the house, took a nap and –

MICHAEL THEDFORD: And left [F.T.] —

INVESTIGATOR SELMAN: And left [F.T.] in the car?

MICHAEL THEDFORD: (Crying.)

INVESTIGATOR SELMAN: Was she in the —-in the car seat?

MICHAEL THEDFORD: She was in the caret, [sic] buckled in. (Inaudible.) (Crying.)

to check in children.  The computer automatically displayed and selected the names and photographs of all three of appellant's children to be checked in.  To indicate he was not dropping off F.T., appellant deselected her name then approved the check-in information as modified, leaving C.T. and H.T. at the day care at 8:28 a.m. Appellant kept F.T. in her car seat and drove 2.1 miles home, arriving before 9:00 a.m.  When appellant arrived home, he exited his car, entered his home and went to sleep leaving F.T. in her diaper, buckled into her car seat, unattended in the car for five hours.  F.T. died.

When appellant awoke, he removed F.T. from her car seat, removed drawers from the refrigerator and put F.T. in the refrigerator.[2]  Appellant called 911, the transcript of which was presented to the jury:

> MICHAEL THEDFORD: Hi. I just woke up from a nap and I found my baby dead.
>
> COLLIN COUNTY DISPATCHER: What was that?

---

[2] Investigator Danny Stasik testified:

> So when I talked to him initially, that's when he finally admitted that, yes, he did leave the child in the vehicle.
>
> Q. When the defendant spoke to you, did he say when he got [F.T.] out of the vehicle whether or not he knew she was deceased or not?
>
> A. Yeah. He -- yes, ma'am. He knew that the child was deceased or believed that the child was deceased, yes, ma'am.
>
> Q. And did he also admit to you that after he knew the child was deceased, that he had actually placed her in the refrigerator?
>
> A. That is correct.
>
> Q. And does he actually demonstrate that on the walk-through video, as the jury will be able to see when the video is available?
>
> A. That is also correct, ma'am.

MICHAEL THEDFORD: My baby. My six-month-old baby. I found her dead.

. . . .

MICHAEL THEDFORD: Oh, six months old. She's completely stiff. (Inaudible) — it's awful.

COLLIN COUNTY DISPATCHER: How long — how log [sic] has it been since you saw her?

MICHAEL THEDFORD: I fell asleep at around 9 o'clock in the morning.

COLLIN COUNTY DISPATCHER: Okay. She was asleep?

MICHAEL THEDFORD: I didn't mean to be asleep — she was. I didn't mean to sleep that long.

. . . .

MICHAEL THEDFORD: Oh, that was awful. I'm sorry. Oh.

COLLIN COUNTY DISPATCHER: Okay. So no one was watching her? You were asleep since 9:00 a.m.; is that right?

MICHAEL THEDFORD: She was in the bassinet beside me. Didn't make a noise, or if she did, I didn't wake up.

COLLIN COUNTY DISPATCHER: Okay. She was in the bed right beside you?

MICHAEL THEDFORD: In the bassinet ~

COLLIN COUNTY DISPATCHER: Okay.

MICHAEL THEDFORD: ~ she ~ the bassinet next to the bed.

COLLIN COUNTY DISPATCHER: Okay.

MICHAEL THEDFORD: Oh. I'm so...

. . . .

MICHAEL THEDFORD:  She's stiff but not cold.

COLLIN COUNTY DISPATCHER:  Okay.  Is there any breaths at all?

(Inaudible voices on the phone.)

MICHAEL THEDFORD:  No, not at all.

[EMT dispatcher added to call.]

MICHAEL THEDFORD:  She's burning hot to the touch.  Burning hot.  She had a fever this morning.

COLLIN COUNTY DISPATCHER:  I've got Mr. Thedford on the phone with us.  His six-month-old baby is stiff and — uh — purple in the face.  He said that she's not cold.

AMR DISPATCHER:  We've got a six-month-old baby.  Okay.

COLLIN COUNTY DISPATCHER:  Michael?

MICHAEL THEDFORD:  Burning hot to the touch.  Burning hot.  She had a fever this morning.  Yes?  Okay.

. . . .

AMR DISPATCHER:  Okay.  Can you tell me exactly what happened?

MICHAEL THEDFORD:  I put the baby in the bassinet beside me, beside the bed.  I sleep on the other side of the bed from that, but it's — still, she was in the room with me.  And — oh, she's so hot.

. . . .

AMR DISPATCHER:  Okay.  I have the paramedics en route.  We're going to get you some help.  Okay?

MICHAEL THEDFORD:  Ahhh.

AMR DISPATCHER:  Is she breathing?

MICHAEL THEDFORD:  That's wonderful.  No, not at all.

AMR DISPATCHER:  No?  Okay.

–5–

MICHAEL THEDFORD: No, not at all. Can't feel anything moving down. I can't feel anything. Well, I can feel heat coming off of her.

COLLIN COUNTY DISPATCHER: You can feel heat coming off? Okay.

MICHAEL THEDFORD: Heat. Yes.

Melissa Firefighter Captain Alan Sheehy and paramedic David Weimer and another paramedic arrived at approximately 1:30 p.m. passing the van with an open door as they entered the house. F.T. was in the kitchen, and drawers with food in them were removed from the refrigerator. The paramedics noticed lividity on F.T.'s bottom (pooling of blood at the lowest point in a person's body several hours after her heart stops beating) and rigor mortis (muscle stiffening). Instead of being cold to the touch as is normal with lividity, F.T.'s body was hot. Appellant told Sheehy F.T. had a fever that morning, and she had been in her bassinet next to his bed while he slept, but never told Sheehy about leaving F.T. in a hot vehicle. Had Weimer known F.T. had been left in a hot car, he would have used different protocols to try to save her. Appellant showed Sheehy the bassinet next to the bed. The bedroom was a comfortable temperature. F.T. felt much warmer than the bedroom. The paramedics in consultation with their medical director determined F.T. was dead and stopped resuscitation efforts.

At 2:27 p.m., thirty minutes after F.T. was pronounced dead, Weimer took her core body temperature through her anus which measured 105.2° F. Sheehy testified normal temperature was 98.6° and bodies cool down after death. The bedroom

thermostat was set for 70° F. The base of F.T.'s car seat measured 112° F. Sheehy further testified he did not think appellant provided accurate information and informed the fire chief who relayed the information to the sheriff's deputies at the scene.

F.T.'s mother told an investigator at the scene she had called appellant who screamed and told her that F.T. "was cold and not breathing." A forensic examination of appellant's cell phone indicated he was actively using it before his wife called. Appellant told Investigator Stasik the medication he took made him tired so he went straight to bed when he arrived home from the day care. After his recorded statement, appellant agreed to participate in a recorded walk-through, during which he stated when he arrived home he checked his Skype and emails.

The medical examiner testified he determined the cause of death was heat stroke and the manner of death was "accident." He further testified by "accident" he meant "something transpired that was unforeseen and caused someone's death." He explained he was "not saying the defendant didn't recklessly or with criminal negligence leave his child in a hot car." And he further explained by analogy to drunk driving deaths which he usually classifies as accidents unless it is a hit and run in which case he classifies those as homicides. Even some of the ones he classifies as accidents "go[] to court."

After the State rested and the trial court granted appellant's motion for instructed verdict on the first count, manslaughter, appellant called Amy Lindgren.

Lindgren is a pediatric nurse practitioner who saw F.T. for a fever the day before her death. Lindgren described appellant's interaction with his children and F.T. specifically as very caring and involved. Lindgren also described the increased risk of confusion, stroke, seizure, coma, and death when children are left in cars on hot days from about 8:30 a.m. to 1:00 p.m. Lindgren testified she was aware a car could reach its maximum temperature in the first hour and that "it's never okay to leave kids in a car for any amount of time." Lindgren agreed with the prosecutor that leaving a child in a "car even for a few minutes, that you run the risk that something bad could happen to your child." Lastly, Lindgren testified that people become familiar with the effects on themselves of medicine they take frequently.

Appellant called David Diamond, who earned his Ph.D. in biology in the Department of Psychobiology and Center for the Neurobiology of Learning and Memory. The majority opinion summarizes his testimony explaining how appellant could forget he had F.T. in her car seat behind him. In addition, Diamond testified 43 children was the largest single year (2017) number of children that died of heat stroke in the United States. Diamond testified vehicles left closed in sunlight can increase 40º to 50º even when the outside temperature is in the 60's, so a closed car in the sunlight can quickly exceed 100º inside.

Appellant also called two other witnesses who testified he loved and was involved with his children. The State called a sheriff's deputy as a rebuttal witness to read the warning labels on three medications found at the scene:

- "may cause drowsiness and doziness.  Careful using vehicle, vessel, or machine," and "take or use this medicine exactly as directed.  Do not skip doses or discontinue";

- "may cause dizziness"; and

- "may cause drowsiness, use care when operating a vehicle, vessel, or machine[.]"

There is no complaint about the charge which instructed the jury:

Our law provides that an actor commits the offense of "**Criminally Negligent Homicide**" if he causes the death of an individual by criminal negligence[.]

. . . .

Our law provide [sic] that an actor commits the offense of "**Abandoning or Endangering a Child**" if he intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child younger than 15 years in imminent danger of death, bodily injury, or physical or mental impairment.

. . . .

A person acts with "**criminal negligence**, or is criminally negligent", with respect to the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the result will occur.  The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

A person is **criminally responsible** if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

. . . .

## COUNT I
## CRIMINALLY NEGLIGENT HOMICIDE

Now, if you find from the evidence beyond a reasonable doubt that on or about the 21st day of June, 2016, in Collin County, Texas, the defendant, MICHAEL SHANNON THEDFORD, did then and there, with criminal negligence, cause the death of an individual, namely, [F.T.], by leaving [F.T.] unattended in a motor vehicle without air conditioning or water, then you will find the defendant guilty of the offense of Criminally Negligent Homicide.

. . . .

## COUNT III
## ABANDON/ENDANGER A CHILD WITH IMMINENT DANGER OF BODILY INJURY

Now, if you find from the evidence beyond a reasonable doubt that on or about the 21st day of June, 2016, in Collin County, Texas, the defendant, MICHAEL SHANNON THEDFORD, did then and there, with criminal negligence, engage in conduct that placed [F.T.], a child younger than fifteen (15) years of age, in imminent danger of death, bodily injury, or physical or mental impairment, by leaving [F.T.] unattended in a hot vehicle, or by leaving [F.T.] in a vehicle without air conditioning then you will find the defendant guilty of Abandon/Endanger a Child with Imminent Danger of Bodily Injury as charged in Count III of the indictment.

(Emphasis added on the subject matter of the definitions). The jury answered unanimously that appellant was guilty of counts I and III. The State announced its intent to proceed to punishment on count I. The State and appellant then announced their agreement to a sentence of two-years' confinement in the state jail, probated for five years. The trial court agreed and sentenced appellant according to the parties' agreement, then entered judgment on count I.

–10–

# II.
## APPLICABLE LAW

### A. Standard of Review

When an appellant challenges the sufficiency of the evidence supporting a criminal offense on which the State has the burden of proof, we conduct our review under the single sufficiency standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Acosta v. State*, 429 S.W.3d 621, 624–25 (Tex. Crim. App. 2014). We view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2011). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Therefore, in analyzing legal sufficiency, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Id.* "When the reviewing court is faced with a record supporting contradicting inferences, the court must presume that the jury resolved any such conflicts in favor of the verdict, even if not explicitly stated in the record." *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017) (citing *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012)). When the record supports conflicting inferences, we presume the factfinder resolved the conflicts in favor of the verdict

–11–

and therefore defer to that determination. *Clayton*, 235 S.W.3d at 778. Direct and circumstantial evidence are treated equally: circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Id*.

**B. Criminally Negligent Homicide**

Section 6.03(d) of the penal code defines criminal negligence as follows:

A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PENAL CODE § 6.03(d). The legal sufficiency standard applied to criminally negligent homicide "requires the State to prove that (1) the defendant's conduct caused the death of an individual; (2) the defendant ought to have been aware that there was a substantial and unjustifiable risk of death from his conduct; and (3) his failure to perceive the risk constituted a gross deviation from the standard of care an ordinary person would have exercised under like circumstances." *Queeman*, 520 S.W.3d at 622–23 (citing *Montgomery*, 369 S.W.3d at 193; TEX. PENAL CODE §§ 6.03(d), 19.05(a)). "Criminal negligence does not require proof of [a defendant's] subjective awareness of the risk of harm, but rather [the defendant's] awareness of the attendant circumstances leading to such a risk." *Id*. (quoting

*Montgomery*, 369 S.W.3d at 193). "The key to criminal negligence is not the actor's being aware of a substantial risk and disregarding it, but rather it is the failure of the actor to perceive the risk at all." *Id.* (quoting *Montgomery*, 369 S.W.3d at 193).

### III.
#### ANALYSIS

The jury heard all the testimony recited above and was instructed in the definition of criminal negligence that, "[t]he risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." On this evidence, a reasonable juror could conclude (1) appellant's conduct caused F.T.'s death; (2) appellant ought to have been aware that leaving F.T. in a closed car on a hot summer day in late June in Texas created a substantial and unjustifiable risk of F.T.'s death from his conduct; and (3) appellant's failure to perceive the risk was a gross deviation from the standard of care of ordinary parents even when taking prescribed medications. *See Queeman*, 520 S.W.3d at 622–23. As to the third element, the court of criminal appeals also explained that,

> Criminal negligence does not require proof of appellant's subjective awareness of the risk of harm, but rather ***appellant's awareness of the attendant circumstances leading to such a risk***. The key to criminal negligence is not the actor's being aware of a substantial risk and disregarding it, but rather it is the ***failure of the actor to perceive the risk at all***. Conduct that constitutes criminal negligence involves a ***greater risk of harm to others, without any compensating social utility***, than does simple negligence.

–13–

*Montgomery*, 369 S.W.3d at 193 (emphasis added). Here, a reasonable juror did *not* have to conclude that appellant was aware F.T. was in her car seat and nevertheless left her there to convict appellant of criminally negligent homicide. *Id*. Rather, a reasonable jury could decide—even for the reasons espoused by Diamond—that appellant forgot F.T. was in her car seat when he left her in the car. As to attendant risks, on this evidence a reasonable juror could decide appellant was aware of the attendant circumstances that: F.T. was in the car (appellant buckled her in, indicated on the computer he was not leaving her), it was late June in Texas and would be a hot day, and F.T. had no mental or physical ability to free herself from her car seat to crawl down out of her car seat and open a window or car door. As to failure to perceive the risk, a reasonable juror could decide appellant failed to perceive the risk when he exited his car (consistent with Diamond's testimony). As to the enormity of the risk, a reasonable juror could decide appellant's conduct of leaving F.T. in his car had a greater risk of harm to others (F.T.), without any compensating social utility. *See id*.

In making these assessments from the evidence presented to the jury, I draw all inferences from the evidence in favor of the verdict as we must do. *Queeman*, 520 S.W.3d at 622; *Montgomery*, 369 S.W.3d at 192; *Clayton*, 235 S.W.3d at 778. In doing so, where there are two inferences that could be drawn from the evidence, we are *obligated* to "presume that the jury resolved any such conflicts in favor of the verdict, even if not explicitly stated in the record" and defer to its determination.

–14–

*Queeman*, 520 S.W.3d at 622 (citing *Montgomery*, 369 S.W.3d at 192); *see Clayton*, 235 S.W.3d at 778. Significantly on this record, appellant lied about what happened to his wife, the two 911 dispatchers, the paramedics, the fire chief, and the police in an effort to conceal that appellant caused F.T.'s death by leaving her in the closed vehicle. In this context, a reasonable juror could view appellant's placing F.T. in the refrigerator as connected to his lie to his wife that F.T. was cold indicating appellant sought to cover up his guilt for F.T. death. So, a reasonable juror could weigh appellant's credibility and conclude appellant lied to six people to avoid the consequences of his actions, that his story about being sleepy and being affected by medications was also a lie, and the truth was what he said on the walk through video: he exited the car and checked his Skype and emails. That is, a reasonable jury could conclude appellant paid attention to his computer or social media at the cost of failing to pay attention to his six-month-old child strapped into her car seat.

The State points out the jury could have reached its conclusion relying in part on a significant statistic Diamond testified to: the largest number of children in the United States that died of heat stroke in a single year was 43 in 2017. I agree. The only reasonable inference from Diamond's testimony is that there were even fewer hot-car deaths of children in 2016, the year of this offense, that is, it was an even rarer occurrence. A reasonable juror could infer from Diamond's testimony that out of the of millions of parents in the United States who in the aggregate transported their children in cars millions of times throughout 2016, there were still less than 43

–15–

instances that resulted in a child's heat-stroke death. This evidence strongly corroborates a favorable view of the jury's verdict because so few deaths indicate the conduct resulting in those deaths is "a gross deviation from the standard of care that an ordinary [parent] would exercise." TEX. PENAL CODE § 6.03(d)

Appellant relies on *Ives v. State*, No. 08-16-00026-CR, 2017 WL 3887444, at *6 (Tex. App.—El Paso Sept. 6, 2017, pet. ref'd) (not designated for publication). Diamond also testified in *Ives*, and the court of appeals there acquitted the parent who left her child in her car on the way to teach at school. In *Ives*, the El Paso Court of Appeals relied on the New York Court of Appeals decision that,

> What, we believe, is abundantly clear from our decisions and from the governing statutory language is that criminally negligent homicide requires not only a failure to perceive a risk of death, ***but also some serious blameworthiness in the conduct*** that caused it. The risk involved must have been "substantial and unjustifiable", and the failure to perceive that risk must have been a "gross deviation" from reasonable care.

*Id*. at *5 (emphasis in *Ives*'s quotation) (quoting *People v. Boutin*, 555 N.E.2d 253, 254 (N.Y. 1990)). The *Ives* court decided to not publish its opinion, and in criminal cases "[o]pinions and memorandum opinions not designated for publication by the court of appeals under these or prior rules have no precedential value." TEX. R. APP. P. 47.7. The Texas legislature controls the definition of criminal negligence, and it chose not to include a generalized concept of "some serious blameworthiness" in the text of the statute. *See Queeman*, 520 S.W.3d at 622–23; *Montgomery*, 369 S.W.3d at 193; TEX. PENAL CODE §§ 6.03(d), 19.05(a).

# III.
## CONCLUSION

This jury's verdict reflects its decision that a parent, when transporting a six-month-old child in a car on a hot, Texas summer day, undertakes a well-known, enormous risk: leaving a child in a hot car can result in the death of the child. That risk is "of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." Until the Texas Court of Criminal Appeals adopts a standard such as "[f]orgetting a baby in a car is not inherently sufficiently negligent to merit a criminal sanction," as appellant urges, on this record and according to the applicable Texas statutes and decisions of the Texas Court of Criminal Appeals, there was sufficient evidence for the jury to conclude appellant was guilty of criminally negligent homicide when he alone caused the death of his six-month-old child.

There is pathos in this case that calls out for mercy. The mercy came in the form of the prosecution's agreement with appellant to a sentence of two-years' confinement in the state jail, probated for five years. Appellant did not appeal his sentence, just his guilt.

There is sufficient evidence to affirm his conviction.  Because the majority judicially acquits appellant, I dissent; I would affirm his conviction.

/David Evans/
_____
DAVID EVANS
JUSTICE

180884DF.P05